CLERKS OFFICE U.S. DIST. COURT
AT LYNCHBURG, VA
FILED
3/26/2021
JULIA C. DUDLEY, CLERK
BY:  s/ CARMEN AMOS
DEPUTY CLERK

# UNITED STATES DISTRICT COURT
# WESTERN DISTRICT OF VIRGINIA
### LYNCHBURG DIVISION

|  |  |
|---|---|
| ADDISON CARTER & TYRONE BEAVER, INDIVIDUALLY AND FOR OTHERS SIMILARLY SITUATED, | CASE NO. 6:20-cv-48 |
| *Plaintiffs*, | **MEMORANDUM OPINION** |
| v. | JUDGE NORMAN K. MOON |
| DOMINION ENERGY, INC., *et al.*, | |
| *Defendants.* | |

This is a putative class action filed by Plaintiffs Addison Carter and Tyrone Beaver, two African-American Arc Energy employees, who worked as welders on-site at Dominion Energy's Bear Garden Power Plant. Dominion's subsidiary, Virginia Electric and Power Company, or "VEPCO," operates the Bear Garden Plant. In order to fulfill staffing needs on its government contracts, Dominion/VEPCO subcontracted with third parties like Frenzelit and Arc Energy. Frenzelit and Arc Energy provided staffing at the Bear Garden Plant, and employees from both companies interacted with one another. Dominion banned Plaintiffs from all Dominion sites after an incident between them and a Frenzelit employee. Because their employer, Arc Energy, only serviced Dominion sites, Arc Energy subsequently terminated them.

Plaintiffs have sued Defendants Dominion Energy, VEPCO and its employee William Reed, Frenzelit and its employees Joey Brown, Tom O'Brien, and Christopher Dykes, and Arc Energy and its president Roger Phillips.

All named defendants except Arc Energy and Phillips have filed motions to dismiss.[1] Dkts. 47, 50, 43, 58. The motions raise questions of which individual or corporate defendants would be liable for the alleged racial discrimination. In ruling on the motions to dismiss, the Court must assume the truth of all well-pleaded factual allegations in the complaint and draw any reasonable inferences therefrom in the light most favorable to Plaintiffs.

## I.   FACTS AS ALLEGED

### A. Background & Relevant Parties

Plaintiffs worked as specialty welders for Arc Energy Services, Inc. ("Arc Energy") until March 26, 2019, when they were terminated. Beaver worked as a specialty welder for approximately 22 years. *Id.* While working for Arc Energy, between mid-2014 and early 2019, he exclusively serviced Dominion power plants. *Id.* ¶ 36. Carter was newer to the industry and trained under Beaver for two years. *Id.* ¶ 25. Arc Energy had only one customer, Dominion Energy, Inc. ("Dominion"). *Id.* ¶ 99.

Dominion is a 21,000-person public company that produces and transports energy across 18 states. *Id.* ¶¶ 14, 24. VEPCO, a wholly owned subsidiary of Dominion, operates the Bear Garden Power Plant in New Canton, Virginia, where it employed William Reed[2] as the on-site

---

[1] Arc Energy and Roger Phillips are the two additional defendants not represented in this motion to dismiss. Together, Arc Energy and Phillips submitted a motion to transfer venue or dismiss after the case was filed in the Eastern District of Virginia. Dkt. 39, 68. That court denied their motion to dismiss but  granted the motion to transfer. Dkt. 71. Arc Energy and Phillips did not file any additional motions.

[2] The amended complaint refers to "William Reed." Plaintiffs now believe the individual's proper name is "William Whitworth." The Court will refer to the Defendant as Reed. Plaintiffs filed a motion to amend, in order to fix their mistake. Dkts. 87, 99. For the reasons discussed in this opinion, Court will deny Plaintiffs' motion without prejudice.

station director.[3] *Id.* ¶ 14. Given the nature of its work, Dominion staffs many large service projects with subcontractors. *Id.* ¶ 15.

At the Bear Garden Plant, Dominion contracted with Frenzelit, Inc. ("Frenzelit"). *Id.* At the site, Frenzelit employed Joey Brown as a welding and labor supervisor, Tom O'Brien as a field services manager, and Christopher Dykes as a welder. *Id.* ¶¶ 17–18, 20.

Dominion also subcontracted with Arc Energy, which provided specialty welders to the Bear Garden Plant. *Id.* ¶ 16. Arc Energy staffs approximately 1,500 people at Dominion worksites. *Id.* Arc Energy employed Plaintiffs until March 26, 2019. *Id.* ¶ 13. While the amended complaint clearly alleges Frenzelit and Arc Energy were both subcontractors of Dominion/VEPCO, it does not expressly state the relationship between Frenzelit and Arc Energy.

### B.  *Racial Composition of Dominion/VEPCO, Frenzelit, and Arc Energy*

Throughout their welding careers, Plaintiffs worked at several of Dominion's power plants. *Id.* ¶ 34. Dominion has plants in West Virginia, Massachusetts, Pennsylvania, New Jersey, California, Iowa, Florida, Maryland, Georgia, North Carolina, South Carolina, and Virginia. *Id.* From mid-2014 through his termination in March 2019, Beaver worked exclusively at Dominion power plants. *Id.* ¶ 36. During this time, Beaver rarely saw any African Americans at Dominion job sites: he only saw "1–2 African Americans at sites with as many as 50–100 employees." *Id.* ¶¶ 37, 112. When he did see African Americans, most of them were "runners" or other unskilled laborers. *Id.* ¶ 112. Plaintiffs also allege that Dominion's corporate managers are almost all white, just like the management at the Bear Garden Plant. *Id.* ¶ 39. Plaintiffs further assert that African

---

[3] Plaintiffs' amended complaint often refers to Dominion and VEPCO jointly ("Dominion/VEPCO"). Thus, the Court refers to Dominion/VEPCO when noting allegations that refer to the parties as a joint entity. Where Plaintiff makes individualized allegations against either Dominion or VEPCO, the Court uses the individual entity's name. The Court uses Dominion/VEPCO without deciding whether they are an integrated employer.

Americans are underrepresented within Dominion/VEPCO's power plant workforce, relative to the available and qualified African American labor pool. *Id.* ¶ 53. Plaintiffs extend their assertions to include Dominion/VEPCO's labor suppliers because they never encountered minority managers at Frenzelit or Arc Energy during their time at the Bear Garden Plant. *Id.* ¶¶ 40–41.

### C.  Specific Instances of Discrimination at the Bear Garden Plant

On March 19, 2019, Plaintiffs reported to the Bear Garden Plant for their first day of work at that site. *Id.* ¶ 57. Upon arriving, they noticed that out of about 125 people present, they were the only African Americans among the skilled laborers. *Id.* ¶ 58.

Plaintiffs attended a mandatory safety and discrimination session, which included a segment on Dominion's "Zero Tolerance" discrimination policy. *Id.* ¶ 62. Following the training, Plaintiffs entered "the [onsite] Frenzelit trailer." *Id.* ¶ 65. Within moments, Dykes, a white male and Frenzelit employee, accosted Carter. *Id.* He grabbed Carter's testicles and called Carter a "pretty young black boy." *Id.* Carter responded by placing Dykes "in a hold." *Id.* Jeremy Helmstetler, the Frenzelit supervisor, later introduced Carter to the all-white crew as "Toby"—a reference to the slave in the mini-series "Roots." *Id.* ¶ 66.

Over the next several days, Dykes's misconduct continued. *Id.* ¶ 67. He pushed and shoved Plaintiffs and told them to "get the f**k out of the way." *Id.* Dykes also discouraged other workers from helping Plaintiffs perform their work assignments—even though Beaver was the senior welder on the worksite. *Id.* ¶ 70. For instance, Dykes interfered with Beaver's helper, a white technician, by telling the technician to ignore Beaver's instructions and follow Dykes's advice instead. *Id.* Dykes's guidance was incorrect and inconsistent with the technician's task. *Id.* Dykes repeatedly and specifically referred to Plaintiffs' race and also threatened co-workers who helped Beaver or Carter. *Id.* ¶¶ 71, 74. No co-workers ever discouraged Dykes's misconduct. Nor did any

supervisors or managers, who observed, received reports of, or became aware of Dykes's conduct, correct or reprimand him. *Id.* ¶ 75. Despite the behavior, Plaintiffs maintained their composure which irritated Dykes further, leading to an escalation the week after Plaintiffs started work. *Id.* ¶ 76.

On March 26, Joey Brown, a Frenzelit employee, filled in as supervisor for Helmstetler. *Id.* ¶ 77. That morning, Dykes entered the trailer and pushed Carter aside while saying "get the f**k out of the way." *Id.* ¶ 78. Carter then asked Dykes if he "had a problem," to which Dykes responded with a racist tirade. Dykes referred to African Americans as a "species" and called them "lazy," before repeatedly calling Carter a "n***er." *Id.* ¶ 79. He then stated that he would call Frenzelit and make sure Carter would never "work for them again," referring to Carter as a "f**king mook." *Id.* ¶ 79. Finally, Dykes told Carter that he wanted to take Carter to his truck, where he could get his whip and "whip [Carter] like they used to do to the slaves." *Id.* Dykes's rant ended when he "thrust his fist into Carter's face, threaten[ed] Carter, and insist[ed] they go to the parking lot to fight." *Id.*

Brown did not step in. Instead, he told Carter to "take it to the parking lot and fight it out." *Id.* ¶ 80. Dykes continued directing racial and homophobic epithets and insults at Carter. *Id.* Rather than engaging in a physical altercation, Carter exited the area and went to the Dominion/VEPCO site office to file a discrimination complaint. *Id.* ¶ 82. Carter spoke with Reed, Dominion's on-site station director. *Id.* ¶ 86. Carter told Reed what happened and that he wanted to file a written incident report. *Id.* But during the meeting between Carter and Reed, Brown entered the office and notified them that he had "made a decision" and that Plaintiffs needed to "get their stuff and leave the site." *Id.* ¶ 86. Brown said that Dykes would be required to leave as well. *Id.* Reed did not permit Carter to complete a written complaint. *Id.* ¶ 87. Brown apologized about the situation to

5

Reed. *Id.* ¶ 88. Brown expressed to Reed that the President of Frenzelit's North American subsidiary instructed that all involved persons be removed from the site. *Id.* Beaver asked Brown why he needed to leave, but Brown gave no explanation other than to "just leave." *Id.* ¶ 89.

Plaintiffs headed to their truck, but decided that they should not leave without filing a written complaint with Dominion/VEPCO, so they went back to see Reed. *Id.* ¶ 90. Reed advised them that, because Dykes had already left the site, completing a statement would "not be necessary." *Id.* ¶ 91. Reed then spoke with Carter in private. *Id.* ¶ 92. He told Carter, "Look, I can tell you are angry, 20 years ago I was like you, but when things like this happen in life, you have to look the other way, and don't look back. Alright?" *Id.* ¶ 93. After this private comment, Reed addressed Beaver and said, "You guys go get some rest now, you will be alright." *Id.* Plaintiffs left without completing a written complaint. *Id.* ¶ 94.

Following the incident, Plaintiffs called managers at Frenzelit and Arc Energy. *Id.* ¶¶ 95– 96. When Carter spoke with Tom O'Brien, the Frenzelit field service manager in Winston Salem, North Carolina, O'Brien laughed and said, "Yeah, I know, you and [Beaver] are gone." *Id.* ¶ 95. Carter's initial phone call with Arc Energy was more reassuring. A staffing person told him that Arc Energy would get Plaintiffs a new project quickly, and that the company would make some calls to find out what happened. *Id.* ¶¶ 96–97. However, when Plaintiffs next spoke with Arc Energy, the company president, Roger Phillips, confirmed that Dominion/VEPCO banned Plaintiffs from all Dominion sites. *Id.* ¶ 99. Because Arc Energy only supplied labor to Dominion worksites—and Plaintiffs could no longer work on those sites—Arc Energy terminated them. *Id.*

At a later point, Plaintiffs learned that Dykes had not been required to leave the Bear Garden Plant on March 26. *Id.* ¶ 104. They also learned that Frenzelit's O'Brien attempted to secure false statements from several witnesses to the March 26 incident. *Id.* ¶ 105. Specifically,

6

O'Brien approached Timothy McCathern, a white man who worked with the Plaintiffs during their time at the Bear Garden Plant. *Id.* ¶ 106. O'Brien asked McCathern to sign a statement that placed the blame for the altercation on Plaintiffs. *Id.* McCathern refused to sign the statement because he believed Plaintiffs did nothing wrong. *Id.* O'Brien responded that, "the more statements the better," and "you're either with Frenzelit or against us." *Id.* Again, McCathern refused to sign the statement. *Id.* Frenzelit terminated him the next day. *Id.* Prior to the March 26 incident, McCathern had informed his superiors about examples of Dykes's racially motivated conduct, including when Dykes called McCathern a "n***er lover." *Id.* ¶ 107.

Plaintiffs also claim that all Defendants published or republished the fact that Dominion/VEPCO banned them from its worksites. *Id.* ¶ 108. Due to Dominion/VEPCO's ban, Plaintiffs cannot work at a large number of power plants. *Id.* ¶ 124. In fact, before finding a specialty welding job in Connecticut, Carter could not find welding work for 5 months. *Id.* ¶ 125.

Plaintiffs filed the original complaint in this case on March 3, 2020, Dkt. 1, and filed an amended complaint on March 25, 2020, Dkt. 11.

### D.  *Plaintiffs' Claims*

Plaintiffs' amended complaint includes the following claims: two class claims of racial discrimination (counts I and II) against Dominion/VEPCO; individual claims of unlawful discrimination in the right to contract (counts III and VII), retaliation (counts IV and VI), and disparate treatment and hostile work environment (count V) against Dominion/VEPCO, Frenzelit, and Arc Energy; conspiracy to interfere with civil rights (count VIII) against Dykes, Brown, Reed, O'Brien, and Phillips; defamation (count IX) against all Defendants; and insulting words (count X), battery (count XI), and assault (count XII) against Dominion/VEPCO, Frenzelit, and Dykes.

## II.      LEGAL STANDARD

A motion to dismiss pursuant to Federal Rule of Civil Procedure 12(b)(6) tests the legal sufficiency of a complaint to determine whether a plaintiff has properly stated a claim; it "does not resolve contests surrounding the facts, the merits of a claim, or the applicability of defenses." *Republican Party of N.C. v. Martin*, 980 F.2d 943, 952 (4th Cir. 1992). When challenged by a motion to dismiss under Rule 12(b)(6), a plaintiff's allegations must "raise a right to relief above the speculative level." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007). The complaint must state a claim that is plausible on its face. *Id.* at 556. The Court must take all facts and reasonable inferences in favor of the plaintiff, disregard any legal conclusions, and not credit any formulaic recitations of the elements. *See Iqbal v. Ashcroft*, 556 U.S. 662, 678 (2009); *Giarratano v. Johnson*, 521 F.3d 298, 302 (4th Cir. 2008).

## III.      DISCUSSION

### A.   *Vicarious Liability Claims Against Dominion/VEPCO and Frenzelit (Insulting Words, Battery, and Assault)*

Counts X–XII (insulting words, battery, and assault) seek to hold Dominion/VEPCO and Frenzelit vicariously liable for Dykes's alleged misconduct. This subsection addresses whether the companies would otherwise be liable for any of Dykes's allegedly unlawful conduct under theories of respondeat superior or ratification.

Respondeat superior liability is limited to tortious acts performed "within the scope of the duties of the employment and in the execution of the service for which the employee was engaged." *Parker v. Carilion Clinic*, 819 S.E.2d 809, 821 (Va. 2018) (internal quotation marks omitted). Stated differently, vicarious liability may be imposed on an employer "when the employee

committed the tort while 'performing a normal function' of his assigned job." *Our Lady of Peace, Inc. v. Morgan*, 832 S.E.2d 15, 23 (Va. 2019) (quoting *Parker*, 819 S.E.2d at 819). Plaintiffs cannot establish respondeat superior merely by showing that the employee was "on the clock," using the employer's property, or on the employer's premises at the time of the tortious acts. *Parker*, 819 S.E.2d at 821. An employer is not liable for an unauthorized tortious act by an employee arising "wholly from some external, independent, and personal motive on the part of the employee to do the act upon his own account." *Id.* (internal quotation omitted).

In addition to respondeat superior, Dominion/VEPCO and Frenzelit could be liable under an agency theory of ratification. Under general agency principles, "[r]atification is the affirmance by a person of a prior act which did not bind him but which was done or professedly done on his account, whereby the act, as to some or all persons is given effect as if originally authorized by him." Restatement (Second) of Agency § 82 (1958). However, in Virginia, "[o]f all the grounds for imputed tort liability, ratification is the most arcane." Anthony W. Kraus, *Ratification of Torts: An Overview and Critique of the Traditional Doctrine and Its Recent Extension to Claims of Workplace Harassment*, 32 Tort & Ins. L.J. 807, 807 (1997).

"A principal is bound by his agent's previously unauthorized act if he ratifies the act by accepting its benefits with full knowledge of the relevant facts, or, if upon learning of the act, he fails to promptly disavow it." *Smith v. Mountjoy*, 694 S.E.2d 598, 603 (Va. 2010) (internal quotations omitted). *See also Meade v. Johnson Mem'l Hosp.*, No. 1:10-CV-00024, 2010 WL 3463639, at *6 (W.D. Va. Sept. 2, 2010) (stating that ratification requires the principal to have (1) "factual knowledge of the agent's conduct," and to (2) "expressly confirm[] the conduct or act[] affirmatively in response to it").

Under either theory, Dominion/VEPCO cannot be found vicariously liable for Dykes's actions. First, under respondeat superior, a prerequisite for liability is an employer-employee relationship. As it stands, the amended complaint alleges that Dykes is an employee of Frenzelit, not Dominion/VEPCO. Dkt. 11 ¶ 17. Second, under a theory of ratification, a prerequisite for liability is a principal-agent relationship. *See* Restatement (Second) of Agency § 82 (1958) ("[T]here is no ratification unless an act has been done which the purported or intended principal could have authorized, by one who purported to act as agent or intended to act as servant; and unless the act is affirmed, while still capable of ratification, by a person who, at the time of affirmance, knows the facts, who can authorize such an act, and who is the person for whom the agent purported or intended to act.") (internal citations omitted); *see also W.T. Grant Co. v. Owens*, 141 S.E. 860, 862 (Va. 1928) (citing the standard for ratification); *Kern v. J.L. Barksdale Furn. Corp.*, 299 S.E.2d 365, 367 (Va. 1983) (relying on Restatement (Second) of Agency in considering ratification of contract claim). The amended complaint fails to allege that Dykes acted, or purported to act, as an agent of Dominion/VEPCO. Thus, Dominion/VEPCO cannot be vicariously liable for Dykes's conduct.

By contrast, with respect to Frenzelit, the amended complaint includes sufficient allegations to establish that the company ratified Dykes's behavior. First, Plaintiffs allege that Frenzelit was aware of Dykes's conduct. For instance, prior to the incident on March 26, Plaintiffs' coworker, McCathern, witnessed Dykes's conduct towards Plaintiffs and reported it to Frenzelit's field services manager, O'Brien. Dkt. 11 ¶¶ 106–07. After learning of the conduct, O'Brien took no action to address it. *Id.* Frenzelit's welding and labor supervisor, Brown, was also aware of the misconduct. *Id.* ¶ 80. Yet, on March 26, after Dykes unleashed a racist tirade against Carter and "thrust his first" into Carter's face, Brown actively encouraged Dykes and Plaintiffs to "take it to

10

the parking lot and fight it out." *Id.* Following the incident, Brown demanded that Plaintiffs leave the site because he had "made a decision." *Id.* ¶ 86. The facts in the amended complaint also allege that Brown lied to Plaintiffs about Dykes being required to leave the site that day. *Id.*

In addition to Brown affirmatively and contemporaneously supporting the behavior on March 26, Frenzelit also attempted to solicit false statements from their employees *after* the incident. *Id.* ¶¶ 105–06. O'Brien asked McCathern to sign a statement placing all the blame on Plaintiffs. *Id.* ¶ 106. When McCathern refused—on the grounds that the proffered statement was false—O'Brien responded: "you're either with Frenzelit or against us." *Id.* McCathern was fired the day after refusing to sign the statement. *Id.* After the March 26 events, Carter called O'Brien about the incident—to which O'Brien laughed and said, "Yeah, I know, you and [Beaver] are gone." *Id.* ¶ 95. Taken together, the allegations present sufficient facts to state a claim for vicarious liability under a theory of ratification. Frenzelit's course of conduct, as alleged, is enough to show that it had full factual knowledge of Dykes's action, and act affirmatively in response thereto.

As an alternative ground for dismissal, Frenzelit argues that the sole remedy for tortious acts against Plaintiffs is under the Virginia Workers' Compensation Act ("VWCA"). *See* Va. Code Ann. § 65.2-307. But this argument fails. To bar recovery through a common law cause of action under the VWCA, the employee must have sustained an "injury." The VWCA defines "injury" as an "injury by accident arising out of and in the course of the employment." Va. Code Ann. § 65.2–101. "To be covered by the Act, then, three conditions must be satisfied: (1) an injury by accident; (2) arising out of the employment; and (3) arising in the course of the employment." *Sutter v. First Union Nat. Bank of Virginia, Inc.*, 932 F. Supp. 753, 758 (E.D. Va. 1996).

Frenzelit's argument falters at the second step. The "arising out of" prong demands a causal link between the injury and the employment. *King v. DTH Contract Servs.*, 823 S.E.2d 6, 10–11

(2019); *see also Brown v. Reed*, 165 S.E.2d 394, 396 (Va. 1969) ("[T]he words 'arising out of and in the course of employment' should be liberally construed to carry out the humane and beneficent purpose of the Workmen's Compensation Act."). In cases involving intentional torts, "the necessary causal connection may be established if the evidence shows that the attack was directed against the claimant as an employee or because of the employment." *City of Richmond v. Braxton*, 335 S.E.2d 259, 262 (Va. 1985) (citation omitted). "Under this test, if the injury can be seen to have followed as a natural incident of the work and to have been contemplated by a reasonable person familiar with the whole situation as a result of the exposure occasioned by the nature of the employment, then it arises 'out of' the employment." *Baggett Transp. Co. of Birmingham, Ala. v. Dillon*, 48 S.E.2d 819, 822 (Va. 1978) (internal quotation marks omitted). Frenzelit has not established that Dykes's behavior is a risk connected to its business. Nor has Frenzelit shown that the risks of assault, battery, or insulting words are incidental to the "character of the business." *Id.*; *See. Richmond Newspapers v. Hazelwood*, 457 S.E.2d 56, 59 (Va. 1995) (finding that when an employee grabbed a co-worker in the buttocks or genital areas, the claim was not barred under VWCA because the conduct was not fairly traceable to the employment as a contributing proximate cause). At bottom, Frenzelit has not established that Plaintiffs' claim would be covered under the provisions of the VWCA.

For these reasons stated above, the facts alleged are not sufficient to find vicarious liability on the part of Dominion/VEPCO. Therefore, counts X–XII will be dismissed against Dominion/VEPCO. However, the Court finds that the allegations are sufficient to find ratification on the part of Frenzelit.

### B. *Common Claims to All Defendants (Defamation & Conspiracy to Violate Civil Rights)*

Plaintiffs sue all Defendants for common law defamation (individually and under a respondeat superior theory of liability).[4] Plaintiffs claim, on information and belief, that Dykes, Brown, O'Brien, and Reed, told other Dominion/VEPCO and Frenzelit employees that Plaintiffs were "guilty of 'misconduct' resulting in being 'banned from the Bear Garden Dominion site and all Dominion' worksites for a period of five, or more, years." Dkt. 11 ¶¶ 250–51. They further allege that these statements, whether republished internally or externally to the industry, were defamatory. *Id.* ¶ 253.

The elements of a defamation claim in Virginia are "(1) publication of (2) an actionable statement with (3) requisite intent." *Tharpe v. Saunders*, 737 S.E.2d 890, 892 (Va. 2013) (quoting *Jordan v. Kollman*, 612 S.E.2d 203, 206 (Va. 2005)). For a statement to be actionable, it must be both false and defamatory. *Jordan*, 612 S.E.2d at 206. Circumstances may arise where a statement that is facially true is still actionable. This can occur if "the statements conveyed [a] defamatory implication" intended by the speaker, but any implication will be limited to the "plain and natural" meaning of the words. *Edwards v. Schwartz*, 378 F. Supp. 3d 468, 504 (W.D. Va. 2019). "Pure expressions of opinion" are constitutionally protected and "cannot form the basis of a defamation action." *Tharpe*, 737 S.E.2d at 892.

A party can assert qualified privilege as a defense to defamation. Qualified privilege applies if the statements were made in good faith, to and by persons who have corresponding duties or interests in the subject of the communication. *Gov't Micro Res., Inc. v. Jackson*, 624 S.E.2d 63,

---

[4] Plaintiffs also sue all Defendants for conspiracy to violate civil rights under § 1985(3). However, the Court need not address the specific elements of the claim because all parties now agree that § 1985(3) is the wrong vehicle for this claim. Dkt. 64 at 14 ("Defendants correctly point out that Section 1985(3) is not the appropriate vehicle for this claim."). The Court will dismiss count VIII against all Defendants.

70–71 (Va. 2006). Communications made in the context of an employment relationship are covered by this qualified privilege. *See Shabazz v. PYA Monarch*, 271 F. Supp. 2d 797, 806–07 (E.D. Va. 2003) (collecting cases); *Echtenkamp v. Loudon Cnty. Pub. Schs*., 263 F. Supp. 2d 1043, 1063 (E.D. Va. 2003) ("[C]riticism of plaintiff's job performance or manner, even if clearly damaging to the plaintiff's interests, does not necessarily constitute actionable defamation."); *Kroger Co. v. Young*, 172 S.E.2d 720, 722 (Va. 1970) (finding statements made "by an employer to his employees of reason for the discharge of a fellow employee . . . are qualifiedly privileged").

To overcome a defense of qualified privilege, plaintiffs must put forth evidence of malice. *Fuste v. Riverside Healthcare Ass'n Inc.*, 575 S.E.2d 858, 863 (Va. 2003). The Supreme Court of Virginia has held "that employment matters are occasions of privilege in which the absence of malice is presumed." *Larimore v. Blaylock*, 528 S.E.2d 119, 122 (Va. 2000). "Thus, in order to state a claim for defamation, plaintiff[s] must allege facts sufficient ultimately to support a finding by clear and convincing evidence that the statements of her supervisors and co-workers were made with actual, common-law malice." *Echtenkamp*, 263 F. Supp. 2d at 1062.

Plaintiffs' allegations about Defendants' defamation are inconsistent. First, Plaintiffs allege that Defendants republished that Plaintiffs were "'bann[ed]'" and that Plaintiffs "engaged in workplace misconduct justifying their 'ban.'" Dkt. 11 ¶ 108. But Plaintiffs later allege that, on information and belief, Defendants conveyed statements that Plaintiffs had been "guilty of 'misconduct' resulting in being 'terminated,' 'barred,' [or] 'banned' . . ." *Id.* ¶¶ 249–50. Whether the term "misconduct" was published by Defendants is material in the Court's determination. This is because the statements that Plaintiffs were "banned" or "terminated" were not false. A defamatory statement is both false and defamatory. *Jordan*, 612 S.E.2d at 206.

Moreover, if the word "misconduct" was not used, then Plaintiffs' argument that these were defamatory statements by implication is unpersuasive. It is undisputed that Plaintiffs were banned and terminated, and the Court cannot stretch the plain meaning of those terms to impute misconduct. At this stage, to the extent Plaintiffs ask the Court to find that the term "misconduct" in this context is defamatory by implication, the Court declines to do so. Because it is unclear whether Plaintiffs directly quote Defendants or are simply paraphrasing—and especially in light of the inconsistency of the allegations in paragraphs 108, 249, and 250—there are not enough facts alleged to determine that Plaintiffs have pleaded a viable defamation claim.

For the reasons stated above, count IX will be dismissed against Defendants Dominion/VEPCO, Reed, Frenzelit, O'Brien, Brown, and Dykes without prejudice.

### C. Common Claim to Individual Defendants Reed, Brown, O'Brien, and Dykes (Discrimination in the Right to Contract)

Count VII is a § 1981 claim for unlawful discrimination with the right to contract against Reed, Brown, O'Brien, and Dykes. Only Reed and Dykes seek dismissal.

To establish a prima facie case for unlawful discrimination in the interference with the right to contract, plaintiffs must plead facts sufficient to show "(1) membership in [a] protected class, (2) intent on the part of the defendant; and (3) interference with the rights or benefits associated with making and enforcing contracts." *Williams v. Lipscomb*, No. 7:17-CV-00446, 2018 WL 3672752, at *2 (W.D. Va. Aug. 2, 2018) (internal quotations omitted); *Painter's Mill Grille, LLC v. Brown*, 716 F.3d 342, 349 (4th Cir. 2013). "[T]o make out a claim for individual liability under § 1981, a plaintiff must demonstrate some affirmative link to causally connect the actor with the discriminatory action," and the claim "must be predicated on the actor's personal involvement."

*Hawthorne v. Va. State Univ.*, 568 F. App'x 203, 205 (4th Cir. 2014) (quoting *Whidbee v. Garzarelli Food Specialties, Inc.*, 223 F.3d 62, 75 (2d Cir. 2000)).

When a contractual relationship is lacking, plaintiffs must "show that the defendant both possessed sufficient authority to significantly interfere with the individual's ability to obtain contracts with third parties, and that the [defendant] actually exercised that authority to the [plaintiff's] detriment." *Painter's Mill Grille*, 716 F.3d at 351 (citing *Harris v. Allstate Ins. Co.*, 300 F.3d 1183, 1197 (10th Cir. 2002)); *see also Shaikh v. City of Chicago*, 341 F.3d 627, 629 (7th Cir. 2003) ("[Plaintiff's] §§ 1981 and 1982 claims fail for a . . . fundamental reason: Because the City had no power directly to affect [a third party's] proposed sale of the property to [plaintiff], it did not unlawfully or unconstitutionally impede upon [his] ability to purchase the building."). Stated differently, § 1981 "liability only attaches to persons who actually [have] the power or authority to prevent the plaintiff from entering into a contract with the third party." *Harris*, 300 F.3d at 1197.

In *Painter's Mill Grille*, the plaintiff—a tenant and business owner—sued the lawyers representing the plaintiff's landlord. 716 F.3d at 350. The plaintiff alleged that the lawyers told prospective buyers of the plaintiff's business "that they did not want another 'chicken and waffle shack' at the site and made derogatory comments about the restaurant and its customers." *Id.* The Fourth Circuit rejected the plaintiff's § 1981 claim. The panel held that even if the comments resulted in prospective buyers "breach[ing] their written contract for the purchase of the business," that was insufficient to state a claim under the statute because "the complaint [did] not allege that [the lawyers] 'possessed sufficient authority to significantly interfere' with Painter's Mill Grille's contract to sell its business. In addition, no allegations [were] made that [the lawyers] exercis[ed] that authority when making those remarks." *Id.* at 351. The Court found it important that

16

defendants' statements in no way precluded the plaintiff from selling his restaurant or that the statements were of the sort that might "legitimately and reasonably impair an individual's freedom to contract." *Id.* (citing *Shaikh*, 341 F.3d at 632).

Reed argues that Plaintiffs do not allege that he possessed authority to interfere with Plaintiffs' ability to contract—or that he exercised any purported authority to the Plaintiffs' detriment. Indeed, Plaintiffs only allege that Reed may have told an Arc Energy employee that the two were banned from Dominion sites. Dkt. 11 ¶ 98. There are no allegations that Reed had any authority to interfere with Plaintiffs' right to obtain contracts with third parties, or that he actually exercised that authority. Therefore, the amended complaint fails to state a cause of action against Reed.

Similarly, Plaintiffs expressly allege that Dykes was a non-management welder who "was not a supervisor and had no supervisory authority." *Id.* ¶ 70. There are no allegations that Dykes had any degree of supervisory authority or that he had the ability to make employment decisions or interfere with contractual interests. The amended complaint alleges that Dykes made a phone call during his altercation with Carter; but there is no mention of what the phone call was about or how it is linked to an exercise of authority related to contract or employment decisions. *Id.* ¶¶ 79, 85.

Accordingly, the Court finds that Plaintiffs do not allege sufficient facts to support a § 1981 claim against Reed or Dykes and will dismiss count VII against Reed and Dykes with prejudice.

**D. *Remaining Claims Against Dominion/VEPCO (Class and Individual Allegations of Racial Discrimination, Discrimination in the Right to Contract, Disparate Treatment, Retaliation, and Hostile Work Environment)***

Plaintiffs bring six other claims against Dominion/VEPCO. Counts I–VI involve class and individual claims of racial discrimination, disparate treatment, discrimination in the right to contract, retaliation, and hostile work environment under Title VII and § 1981. Dominion/VEPCO seek dismissal of each of these counts for failure to state a claim.

1. <u>Joint Employment Status</u>

Dominion/VEPCO first argue that counts I–VI fail on the grounds that they did not employ Plaintiffs, and thus, there is no claim for relief under Title VII or § 1981. The allegations fail to establish that Dominion/VEPCO were joint employers of Plaintiffs, and therefore the Court will grant Defendants' motions to dismiss counts I, II, IV, V, and VI with prejudice. Although the Court finds insufficient allegations showing that Dominion/VEPCO interfered with Plaintiffs' right to contract with third parties—the Court will deny the motion to dismiss count III without prejudice.

Claims for relief under Title VII and § 1981 are treated the same. *Boyer-Liberto v. Fontainebleau Corp.*, 786 F.3d 264 (4th Cir. 2015); *Lewis v. Cent. Piedmont Cmty. Coll.*, 689 F.2d 1207, 1209 n.3 (4th Cir. 1982). Under both, Plaintiffs must plausibly allege that Dominion/VEPCO was their employer. *See* 42 U.S.C. § 2000e(f); *see Lemon v. Myers Bigel, P.A.*, 985 F.3d 392, 399 (4th Cir. 2021); *see also Greene v. Harris Corp.*, 653 F. App'x 160 (4th Cir. 2016) (addressing joint employment at the motion to dismiss stage). Even if "a defendant does not directly employ the plaintiff, [the defendant] may still be considered an employer under [civil rights] statutes." *Hukill v. Auto Care, Inc.*, 192 F.3d 437, 442 (4th Cir. 1999). "[M]ultiple entities may simultaneously be considered employers for the purposes of Title VII." *Butler v. Drive Auto. Indus.*

*of Am., Inc.*, 793 F.3d 404, 410 (4th Cir. 2015). Under the Fourth Circuit's test in *Butler*, courts

analyze joint employment claims by considering the following nine factors:

> (1) authority to hire and fire the individual;
> (2) day-to-day supervision of the individual, including employee discipline;
> (3) whether the putative employer furnishes the equipment used and the place of work;
> (4) possession of and responsibility over the individual's employment records, including payroll, insurance, and taxes;
> (5) the length of time during which the individual has worked for the putative employer;
> (6) whether the putative employer provides the individual with formal or informal training;
> (7) whether the individual's duties are akin to a regular employee's duties;
> (8) whether the individual is assigned solely to the putative employer; and
> (9) whether the individual and putative employer intended to enter into an employment relationship.

*Id.* at 414.

Although no one factor is dispositive, the Court in *Butler* held that the issue of control

"remains the 'principal guidepost.'" *Id.* The Fourth Circuit also noted that the first three factors

are the most important and the ninth factor is of "minimal consequence." *Id.* The Court linked the

first two factors specifically to control, stating that the first factor "is important to determining

ultimate control," while the second factor is relevant in determining "practical control." *Id.*

Plaintiffs argue that Dominion/VEPCO's ban supports the first *Butler* factor. They contend

that because Arc Energy only contracted with Dominion/VEPCO, Dominion/VEPCO's ban

directly resulted in Plaintiffs' termination. Arc Energy terminated Plaintiffs only after learning that

they were banned at Dominion/VEPCO sites. Plaintiffs further argue that Dominion/VEPCO

demonstrated control through their human resource department's safety and discrimination

presentation—something all contract workers attend. Dkt. 11 ¶ 48. Plaintiffs urge the Court to

view the training as relevant to the second *Butler* factor. They argue that because the work

happened on a Dominion/VEPCO worksite, the third factor also weighs in their favor.

Ultimately, Plaintiffs' argument is unpersuasive. The amended complaint does not allege sufficient facts to support a claim that Dominion/VEPCO were Plaintiffs' joint employer. Specifically, the amended complaint lacks any factual allegations that would tip any of the three most important *Butler* factors in Plaintiffs' favor. Plaintiffs have not pleaded any facts that show anyone at Dominion/VEPCO: (1) had the power to hire or fire them; (2) supervised either of them on a day-to-day basis or had the power to discipline them; or (3) provided any of the equipment they used.

Indeed, the first *Butler* factor weighs *against* finding joint employment. Frenzelit's Brown ordered Plaintiffs off the site on March 26, and it was Arc Energy who terminated them. The allegations in the amended complaint make that clear. Dkt. 11 ¶ 99. Moreover, analogous cases have found that restricting access to property is insufficient to show joint employment—even if that leaves the contractor out of work. *See Gobert v. Saitech, Inc.*, No. 1:09CV673 LG RHW, 2010 WL 4791725, at *2 (S.D. Miss. Nov. 18, 2010), *aff'd*, 439 F. App'x 304 (5th Cir. 2011); *E.E.O.C. v. Valero Ref.-Texas L.P.*, No. 3:10-CV-398, 2013 WL 1168620, at *4 (S.D. Tex. Mar. 13, 2013) (finding no joint employment where an employer "effectively fired" an individual). The alleged facts are insufficient to show control with respect to the first factor.

As to the second factor, Frenzelit, not Dominion/VEPCO, conducted day-to-day supervision. Dkt. 11 ¶¶ 18, 66. On the day in question, it was Brown, a Frenzelit supervisor, who "made a decision" that Plaintiffs needed to vacate the premises. *Id.* ¶ 86. Additionally, Plaintiffs would enter "the [onsite] Frenzelit trailer," not the onsite Dominion/VEPCO office, to get their work assignments. *Id.* ¶ 62. The third factor—relating to furnishing of equipment and place of work—also weighs against joint employment. In their brief, Plaintiffs state that Dominion/VEPCO provided most of their equipment—but that contention does not appear in the amended complaint.

The amended complaint refers to the tools used as "their [Plaintiffs'] tools," not Dominion/VEPCO's tools. *Id.* ¶ 90.

Therefore, under *Butler*, Plaintiffs' alleged facts are insufficient to sustain a claim that Dominion/VEPCO acted as a joint employer. Because employment is an element required under counts I, II, and IV–VI, the Court will dismiss those claims against Dominion/VEPCO with prejudice.[5]

### 2.   Third-Party Discriminatory Interference

To the extent Plaintiffs assert a third-party discriminatory interference claim under count III against Dominion/VEPCO, their allegations are insufficient. An employment relationship is not required to establish a claim for wrongful interference with a third-party contract. *Painter's Mill Grille*, 716 F.3d at 351. The elements for a § 1981 claim are: membership in a protected class, discriminatory intent by the defendant, and interference with the right to contract. *Williams v. Lipscomb*, No. 7:17-CV-00446, 2018 WL 3672752, at *2 (W.D. Va. Aug. 2, 2018). Plaintiffs must also allege facts showing that the defendant had sufficient authority to interfere with Plaintiffs' ability to obtain third party contracts and used that authority. *Painter's Mill Grille*, 716 F.3d at 351. No more is required.

Plaintiffs allege that Dominion/VEPCO interfered with their employment contracts with Arc Energy by barring them from Dominion/VEPCO premises. In doing so, Dominion/VEPCO effectively cut off all contractual rights Plaintiffs had with Arc Energy because Arc Energy only staffs employees on Dominion/VEPCO job sites. However, there are insufficient allegations about Dominion/VEPCO's discriminatory intent. Plaintiffs allege that Dominion/VEPCO did not ask

---

[5] Counts I and II are class claims against Dominion/VEPCO. Because the Court will grant Dominion/VEPCO's motions to dismiss these two counts, the Court declines to address the merits of the class certification issue.

Dykes to leave the Bear Garden Plant after the incident. While Dykes's situation should be considered in determining if racial animus was a factor in barring Plaintiffs from Dominion/VEPCO work sites, it is insufficient, without more, to raise a plausible inference of racial animus and motive on the part of Dominion/VEPCO. Accordingly, the Court will grant Dominion/VEPCO's motion to dismiss count III without prejudice.

### E. Remaining Claims Against Frenzelit (Hostile Work Environment and Retaliation)

In counts V and VI, Plaintiffs assert Title VII claims of hostile work environment and retaliation. Frenzelit seeks dismissal of counts V and VI because Plaintiffs failed to exhaust their administrative remedies.

Frenzelit argues two points: (1) that Plaintiffs failed to explicitly name Frenzelit in their administrative complaint; and (2) in the alternative, that Frenzelit is not substantially identical to the named company. Frenzelit attaches Plaintiffs' administrative complaints to its motion.  In response, Plaintiffs contend that the administrative exhaustion of a complaint with the Equal Employment Opportunity Commission ("EEOC") or Office of Federal Contract Compliance Programs ("OFCCP") is merely a claim processing rule and does not require dismissal on exhaustion grounds. *See Fort Bend Cnty., Texas v. Davis*, 139 S. Ct. 1843, 1849 (2019). Instead, Plaintiffs frame the inquiry as whether the OFCCP complaint sufficiently identified Frenzelit as a joint employer. Plaintiffs claim this is an issue of fact that is inappropriate for resolution at the Rule 12(b)(6) stage.

#### 1.  Consideration of Attached Exhibits

The preliminary issue for this Court is whether to consider Frenzelit's attached exhibits at this stage. Generally, extrinsic evidence may not be considered at the motion to dismiss stage. *Am. Chiropractic v. Trigon Healthcare*, 367 F.3d 212, 234 (4th Cir. 2004). However, when a defendant

attaches a document to its motion to dismiss "a court may consider it in determining whether to dismiss the complaint [if] it was integral to and explicitly relied on in the complaint and [if] the plaintiffs do not challenge its authenticity." *Id.* (quoting *Phillips v. LCI Int'l Inc.*, 190 F.3d 609, 618 (4th Cir. 1999)).

Frenzelit attached Plaintiffs' OFCCP charges of discrimination and an affidavit stating that OFCCP never contacted Frenzelit regarding the charges. Because Plaintiffs (1) discuss and explicitly rely on the OFCCP charges in their amended complaint, Dkt. 11 ¶¶ 10, 12–13, and (2) do not deny the authenticity of the charges, the Court finds it appropriate to consider Plaintiffs' OFCCP charges of discrimination in evaluating whether Plaintiffs exhausted their administrative remedies regarding their claims against Frenzelit. Plaintiffs do not explicitly rely on the affidavit in their amended complaint and the Court will not consider it.

## 2.   Administrative Exhaustion and Substantial Identity

Rule 12(b)(6) dismissal may be appropriate where a plaintiff fails to exhaust administrative remedies. *See, e.g.*, *Stewart v. Iancu*, 912 F.3d 693, 701–02 (4th Cir. 2019). The administrative exhaustion requirement "reflects a congressional intent to use administrative conciliation as the primary means of handling claims, thereby encouraging quicker, less formal and less expensive resolution of disputes." *Balas v. Huntington Ingalls Indus., Inc.*, 711 F.3d 401, 406 (4th Cir. 2013) (internal quotes omitted). Before a federal court may address a Title VII claim, a claimant must exhaust the administrative procedures under 42 U.S.C. § 2000e-5. *See Davis v. N. C. Dep't of Corr.*, 48 F.3d 134, 137 (4th Cir. 1995).

Recently, the Supreme Court held that Title VII's charge-filing requirement is not jurisdictional. *See Fort Bend*, 139 S. Ct. at 1850–51. The Court likened the Title VII charge-filing

to claims processing rules, which speak only to a party's procedural obligations—unrelated to the jurisdiction of federal courts and subject to evaluation under Rule 12(b)(6). *Id.*

Under Title VII, a civil action can only be brought, after administrative proceedings, "against the respondent named in the [administrative] charge." 42 U.S.C. § 2000e-5(f)(1). The naming requirement is important because it (1) notifies the charged party of the asserted violation; and (2) brings the charged party before the administrative agency and permits effectuation of voluntary compliance.

Fourth Circuit dicta has endorsed an exception to the naming requirement known as the substantial identity exception. *Alvarado v. Bd. of Trs.*, 848 F.2d 457, 459 (4th Cir. 1988). The substantial identity exception permits plaintiffs to sue defendants in a district court action even though they were not named in the administrative charge. *See Nicol v. Imagematrix, Inc.*, 767 F. Supp. 744, 751 (E.D. Va. 1991). Courts in this Circuit have considered the following factors in determining if substantial identity exists between two entities: (1) whether there are similar interests between the named and unnamed parties; (2) the ability of the plaintiff to ascertain the unnamed party at the time of the administrative charge; (3) whether the unnamed party had notice of the administrative charge; and (4) prejudice to the unnamed party. *See Equal Emp't Opportunity Comm'n v. 1618 Concepts, Inc.*, 432 F. Supp. 3d 595, 604 (M.D.N.C. 2020); *Zhang v. Sci. & Tech. Corp.*, 332 F. Supp. 2d 864, 867 (D. Md. 2004).

Here, Plaintiffs did not name Frenzelit in their administrative charge. Instead, they only named Dominion as an employer. *See* Dkts. 44-1 at 2, 44-2 at 2. As outlined above, a civil action can only be brought after administrative proceedings "against the respondent named in the [administrative] charge." 42 U.S.C. § 2000e-5(f)(1). Plaintiffs' failure to name Frenzelit in the charge precludes them from filing a Title VII claim against Frenzelit.

Plaintiffs' claim also cannot succeed under a substantial identity theory. That is because Plaintiffs have not alleged sufficient facts to draw a reasonable inference that Frenzelit is substantially identical to Dominion. Plaintiffs knew the identity of Frenzelit prior to filing the charge. They even mentioned Frenzelit in their attachment to the charge, but did not name them as an employer in their filing. Further, Frenzelit is a distinct and separate entity from Dominion. The amended complaint does not allege that the two companies have similar interests, involve the same types of business, are the same size, or are run by the same individuals. Because they were not named in the complaint, OFCCP did not contact Frenzelit and they were not involved in the administrative process. Thus, Plaintiffs have not alleged facts showing substantial identity between Dominion and Frenzelit. For these reasons, the Court finds that Plaintiffs failed to exhaust their administrative remedies against Frenzelit on counts V and VI and those counts will be dismissed without prejudice.

### F.  *Remaining Counts against Dykes (Insulting Words and Assault)*

Plaintiffs also sue Dykes for violation of Virginia's insulting words statute and for common law assault.

#### 1.  Insulting Words (Count X)

Virginia's insulting words law, Va. Code § 8.01-45, reads as follows: "All words shall be actionable which from their usual construction and common acceptance are construed as insults and tend to violence and breach of the peace." Plaintiffs allege that Dykes violated Va. Code § 8.01-45 when he "used personally abusive epithets toward Plaintiffs" in an effort to provoke violent reactions from them. Dkt. 11 ¶ 265. These include allegations that, during the March 26 altercation:

- Dykes said that Plaintiffs' "species" was "lazy." *Id.* ¶ 79;
- Dykes called Carter a "f**king mook." *Id.*;

25

- Dykes repeatedly called Carter a "n***er." *Id.*;
- Dykes told Carter he would "whip [him] like they used to do the slaves." *Id.*

Claims raised under the insulting words statute "ha[ve] been interpreted by Virginia courts to be virtually co-extensive with the common law action for defamation," but require an additional showing that the words "tend to violence and breach of peace." *Potomac Valve & Fitting Inc. v. Crawford Fitting Co.*, 829 F.2d 1280, 1284 (4th Cir. 1987); *Waddle v. Claughton*, No. 4:18-CV-00010, 2019 WL 1049388, at *5 (W.D. Va. Mar. 5, 2019). Unlike defamation claims, however, parties do not have to show publication under the insulting words statute. *Waddle*, 2019 WL 1049388, at *5. "Whether words are insulting and tend to incite violence is determined by the usual construction of the words and their common acceptance in the community." *Goulmamine v. CVS Pharmacy, Inc.*, 138 F. Supp. 3d 652, 668 (E.D. Va. 2015). However, even in instances where words are "disgusting, abusive, [and] repulsive," they cannot always be understood to convey a false representation of fact as the insulting words statute requires. *Crawford v. United Steelworkers, AFL-CIO*, 335 S.E.2d 828, 839 (Va. 1985). Statements also may not be actionable as a matter of law where they "were not delivered in a manner that would tend to incite violence and breach of the peace." *Goulmamine*, 138 F. Supp. 3d at 669 n.8.

The words in this case clearly fit within the statutory text. They are words which, given "their usual construction and common acceptance are construed as insults and tend to violence and breach of the peace." Va. Code § 8.01-45. This is particularly true given the context in which Dykes uttered the words. Dykes directed the words at Carter during the same incident on the jobsite where he "thrust" his fist into Carter's face, threatened him, and told him that he would "whip" him as if he were a slave. Dkt. 11 ¶ 79. He "repeated[]" the n-word a number of times during a rant that lasted "at least several minutes" in front of other white co-workers. *Id.* ¶¶ 78–79. As alleged, Dykes's statements and in the context delivered, conveyed to Carter and his white co-

workers that he was inherently inferior to them because he was black, as well as inferior in the performance of his work on account of his race. "[U]nder the circumstances" and "considering the way in which the words were used," Dykes conveyed these false representations of fact when he directed racial epithets at Carter. *See Crawford*, 335 S.E.2d at 839. The Court therefore rejects Dykes's argument that he could not be liable for his statements because he made no misrepresentation of fact. Dkt. 59 at 12.

Accordingly, the Court will deny Dykes's motion to dismiss count X. Because this Court found sufficient facts alleging ratification of Dykes's conduct on the part of Frenzelit, the Court will also deny Frenzelit's motion to dismiss count X.

### 2. Assault (Count XII)

To state a claim for assault under Virginia law, Plaintiffs must plead sufficient facts demonstrating that (1) Dykes committed an act intended to cause harmful or offensive contact or apprehension of such contact, and (2) that such an act created reasonable fear or apprehension in Carter's mind. *Balas*, 711 F.3d at 412 (citing *Koffman v. Garnett*, 574 S.E.2d 258, 261 (Va. 2003)).

Dykes argues that Plaintiffs do not allege facts supporting a reasonable inference of an apprehension of an imminent battery. Specifically, Dykes says that the statements about "getting his whip" do not constitute assault because there was a lack of immediacy in the action.

However, the Court finds that, read in their totality, Plaintiffs' allegations sufficiently state a plausible claim for assault. When evaluating whether the defendant intended to place the victim in fear or apprehension of bodily harm, "[w]ords and prior conduct are highly relevant in shedding light on intent and the context within which certain actions transpired." *Clark v. Commonwealth*, 691 S.E.2d 786, 789 (Va. 2010). The amended complaint details a multitude of physically threatening actions that Dykes directed at Carter. These include "thrust[ing] [a] fist into Carter's

face," threatening to whip him, "gesturing" at him, and grabbing his genitals. Dkt. 11 ¶¶ 65, 79. Taken together, there is a course of conduct which permits an inference that when Dykes "thrust his fist into Carter's face," and threatened to "whip" him "like they used to do the slaves," that Carter reasonably feared that Dykes would commit an imminent battery against him. Dkt. 11 ¶ 79.

Accordingly, the Court will deny Dykes's motion to dismiss count XII. Because this Court found sufficient facts alleging ratification of Dykes's conduct on the part of Frenzelit, the Court will also deny Frenzelit's motion to dismiss count XII.[6]

### G. *Plaintiffs' Motion to Amend*

Plaintiffs filed a motion to substitute party and relate back—attempting to remedy an error in their complaint, and amended complaint, where they misnamed William Whitworth as William Reed. Dkts. 87, 99. Because Plaintiffs amended their complaint once, as of right, they may not amend their complaint without "the opposing party's written consent or the court's leave." Fed. R. Civ. P. 15(a)(2). Even so, the Rule counsels courts to "freely give leave." *Id.* However, one of the grounds for denial of a motion to amend under Rule 15 is where a proposed amendment would be futile. *See Foman v. Davis*, 371 U.S. 178, 182 (1962); *Everett v. Prison Health Servs.*, 412 F. App'x 604, 606 (4th Cir. 2011). An amendment is futile if the claim would fail to survive a Rule 12(b)(6) motion to dismiss. *See, e.g.*, *Donaldson v. U.S. Dep't of Lab.*, 930 F.2d 339, 349 (4th Cir. 1991); *Johnson v. Oroweat Foods Co.*, 785 F.2d 503, 509 (4th Cir. 1986); *Katyle v. Penn Nat. Gaming, Inc.*, 637 F.3d 462, 471 (4th Cir. 2011) ("Futility is apparent if the proposed amended complaint fails to state a claim under the applicable rules and accompanying standards.").

---

[6] The Court will also deny Frenzelit's motion to dismiss count XII for battery.

Even assuming that an amendment to substitute and relate back would be permitted in this case, amendment would be futile at this stage because there are no claims remaining against Reed. Therefore, the Court will deny Plaintiffs' motion to substitute party and relate back.

## IV.    CONCLUSION

For the reasons set forth, the Court will grant Dominion and VEPCO's motions in full, dismissing all counts against them and Reed. As against Dominion and VEPCO, counts I, II, IV, V, VI, VIII, and X–XII will be dismissed with prejudice and counts III and IX will be dismissed without prejudice. With respect to Reed, the Court will grant the motion to dismiss counts VII and VIII with prejudice and count IX without prejudice. The Court will also grant Frenzelit's motion in part. Count VIII against Frenzelit, Brown, and O'Brien will be dismissed with prejudice and count IX will be dismissed without prejudice. Counts V and VI against Frenzelit will also be dismissed without prejudice. Frenzelit's motion to dismiss counts X–XII be denied. The Court will also grant Dykes's motion to dismiss in part, dismissing count VIII, with prejudice, and dismissing count IX without prejudice. The Court will deny his motion to dismiss counts X and XII. The Court will deny Plaintiffs' motion to substitute and relate back. The Court will permit Plaintiffs to file any motion for leave to amend within thirty days.

At this point, the following claims remain in this case: all claims against Arc Energy and Phillips, § 1981 claims against Frenzelit, Brown, and O'Brien, and the insulting words, assault, and battery claims against Dykes and Frenzelit (through ratification).

The Clerk of the Court is directed to send a copy of this Memorandum Opinion to all counsel of record.

ENTERED this 26th day of March, 2021.


NORMAN K. MOON
SENIOR UNITED STATES DISTRICT JUDGE